## WILKINSON V. DORSEY.

### November 16, 1911.

1. REFORMATION OF INSTRUMENTS—*Mistake—Fraud—Proof Required—Case in Judgment.*—Equity has jurisdiction to reform written instruments in two well-defined classes of cases only, viz: (1) Where there has been an innocent omission or insertion of a material stipulation, contrary to the intention of both parties, and under a mutual mistake; and (2) where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the remaining parties. But to warrant relief on account of mistake, it must be established by the clearest and most satisfactory evidence. It is not enough to show a possibility or even a probability of mistake. In the case in judgment, the evidence not only fails to establish fraud or mistake by clear and satisfactory proof, but the preponderance of the proof maintains the fairness and integrity of the transaction.

Appeal from a decree of the Corporation Court of the city of Roanoke. Decree for the defendant. Complainant appeals.

*Reversed.*

The opinion states the case.

*C. B. & H. M. Moomaw* and *Hall, Woods & Jackson,* for the appellant.

*Scott, Altizer & Watts,* for the appellee.

KEITH, P., delivered the opinion of the court.

The object of the bill in this case was to obtain the specific performance of a contract for the sale of land lying in the city of Roanoke, which is as follows:

"This contract, made this 21st day of September, 1908, by and between E. E. Dorsey, party of the first part, and J. H. Wilkinson, party of the second part, ·

"Whereas the said E. E. Dorsey and her late husband, Joseph M. Dorsey, are indebted to the said J. H. Wilkinson in the sum of $800, evidenced by the notes of the said Joseph M. Dorsey; and

"Whereas the said party of the first part is anxious to provide for the payment of said debt and is willing to make provision therefor;

."Now, therefore, this contract witnesseth, that the said E. E. Dorsey agrees to sell to the said J. H. Wilkinson all that lot or parcel of land lying and being in the city of Roanoke, Va., and described as follows, to-wit:

.    .    .    .    .    .    .    .    .

"And in consideration of the above agreement the said J. H. Wilkinson agrees to pay to the said E. E. Dorsey the sum of $900 for said property.

"It is agreed between the parties that settlement and payment for the above property shall.be made when the property which was owned by the said Joseph M. Dorsey, to-wit, two lots of land, one lying on the west of the above described lot, and one on the east thereof, is sold by decree of court, and it is mutually agreed that so much of the proceeds of the sale of the said two lots belonging to the said Joseph M. Dorsey as is not required for the payment of the cost of the suit and other indebtedness of the said Joseph M. Dorsey shall be applied to the payment of the indebtedness of the said Joseph M. Dorsey and Ella E. Dorsey to J. H. Wilkinson; that the balance of the indebtedness to the said J. H. Wilkinson shall be deducted from the Nine Hundred Dollars ($900.00), the purchase price of the above described

lot, and that any balance which may be due by the said J. H. Wilkinson upon said lot shall be paid by the said J. H. Wilkinson to the said Ella E. Dorsey.

"Witness the following signatures and seals the day and year first above written.

"ELLA E. DORSEY,     (Seal.)

"J. H. WILKINSON,     (Seal.)"

This contract was acknowledged before a notary public on the day of its date, and was admitted to record on the 11th day of October following.

Mrs. Ella E. Dorsey filed an answer, in which she says that she was the wife of Joseph M. Dorsey, who died in the year 1908, owning the two vacant lots in the bill mentioned, and leaving her and her three children with no other means of support than the property mentioned in said contract, which was conveyed to her as her separate estate in the year 1890; that shortly after the death of her husband, she being utterly ignorant of business and wholly unadvised as to her rights, the complainant told her that he held notes of her husband, upon which her name appeared as endorser, to an amount of about $800; that thereupon respondent informed the complainant that she had never endorsed said notes, and that if her name appeared upon them it was placed there without her knowledge or consent; that nevertheless the complainant insisted that respondent was liable on said notes, and said that they had been brought to him with her name on them by respondent's husband, and that she, or at least the property conveyed to her, was liable for their payment; that complainant then proposed that respondent should go with him to the office of the Honorable C. B. Moomaw, whom he represented to respondent as being a good lawyer and one who would rightly advise her as to her liabilities in the premises; that wishing to do what was right, she complied with this suggestion, and when she reached the office of Mr. Moomaw she was there again told

that she and her property were liable for the debt; that so believing, and in ignorance of the fact that Mr. Moomaw was then the attorney for the complainant, she entered into the contract in the bill mentioned, which was then and there prepared at the dictation of Mr. Moomaw and in his office; that she never would have entered into the contract unless she had believed that she or her property was liable for the indebtedness; that she had full confidence that Judge Moomaw would advise her correctly, and does not now believe that he would have permitted her to sign the contract unless he was satisfied that she was liable for the payment of said indebtedness. The facts with reference to the $800 debt are stated to be, that her husband, Joseph M. Dorsey, was indebted to the complainant for materials furnished him some time previous to his death; that after said indebtedness had been incurred and was long past due, her husband gave to Wilkinson certain notes covering the same, upon which he had placed her name as endorser, without her knowledge and consent; that the existence of these notes was unknown to respondent until she was advised thereof by Wilkinson after her husband's death. The answer further states and charges, that the contract is the result of a mutual mistake of the parties thereto, or if complainant was not mistaken in the premises, it was the result of fraudulent and inequitable conduct on his part, and she prays not only that specific performance may be denied, but that the court will proceed further and decree that the contract be annulled and set aside, and to that end that her answer may be taken and treated as a cross-bill, and that complainant may be required to answer the same, but not under oath, and that all other and general relief may be granted respondent as the nature of her case may require and to equity shall seem meet.

Wilkinson answered this cross-bill, denying its allegations and giving his version of the transactions which led

up to the execution of the contract set up in his bill.   Upon
the issues thus made depositions were taken, and the case
was submitted to the corporation court, which entered a
decree denying the specific execution of the contract in the
bill mentioned, and decreeing its cancellation as prayed for
in the cross-bill; and from that decree an appeal was
allowed.

It appears from the proof that Joseph M. Dorsey was a
contract plasterer in the city of Roanoke; that Wilkinson
was a merchant dealing in building material; and that in
the course of business Dorsey became indebted to him.   In
the month of January, 1908, Dorsey owed Wilkinson about
$800.   He was unable to pay the whole of the debt at one
time, and proposed to close the account by notes signed by
himself and endorsed by his wife, the defendant in this
suit, and accordingly eight notes for $100 each were pre-
pared, payable consecutively at from one to eight years.
Dorsey executed these notes on his part, and was about to
endorse them on behalf of his wife, when Wilkinson said
to him: "I thought that you would have your wife endorse
these notes?" to which Dorsey replied: "Well, she is.   This
is the way we do our business.   If you doubt my word, call
up Mrs. Dorsey."   This Wilkinson declined to do, where-
upon Dorsey went to the telephone and called up his wife
and spoke to her about the matter, and asked her if it
would be all right for him to endorse her name.   Wilkinson
did not hear Mrs. Dorsey's reply, but he knew the number
of the telephone of Dorsey's house and knew that Dorsey
called the right number.   When the conversation over the
telephone was finished, Dorsey remarked, "I told you it was
all right," and proceeded to write his wife's name on the
back of the notes.   On the 1st of May, 1908, Dorsey died
without having paid any of the eight notes, none of them
at the time being due.   Some time after the death of Dor-
sey, his widow, the defendant in this suit, went to Wilkin-

son's place of business and stated that she wanted to make arrangements for the payment of these notes. She said that she could not pay the debt and continue to live on her property, and she wanted to go north and live with her husband's people, and asked Wilkinson to take charge of her house and rent it and use the rents for the payment of the notes, but that she did not want to leave the city until the fall of the year. Some time in the month of September she telephoned to Wilkinson and asked him to come down to her home. When he went there she stated to him that she wanted to sell him the property—not only her property but the two vacant lots belonging to her husband. She asked Wilkinson the sum of $1,200 for the whole property, and out of the proceeds of this sale she proposed to pay to Wilkinson the notes above referred to and let him pay her the difference. Wilkinson was of the opinion that the whole property was worth about $1,300, the house and lot being worth $900 and the vacant lots $200 each. It developed that Mrs. Dorsey was not the owner of all the property, and that her late husband was the owner of the two vacant lots; whereupon Wilkinson stated that he doubted if she could make sale of her husband's property. A few days after this conversation, Mrs. Dorsey came up town and telephoned to Wilkinson to meet her at the bank. When they met she said that she wanted some money, and thereupon Wilkinson endorsed her note for $75. At that time Wilkinson said to her that he had consulted an attorney with reference to her right to sell the property of her husband and that the attorney was of the opinion that she could not to do so, and suggested that they go to the office of Mr. Moomaw, an attorney in the city of Roanoke, which they did. On reaching the office of Mr. Moomaw, Mrs. Dorsey, after being introduced to him, proceeded to state the facts hereinbefore set forth—that her husband was dead, that he owned two vacant lots, and that she owned a house and

lot situated between them; that Wilkinson held notes of Dor-
sey for $800 upon which she was endorser; and that she
wished to pay this debt by a sale of the property to Wilkin-
son, receiving from him the difference.    In the conversation
that ensued it appeared that in addition to the notes held
by Wilkinson, Dorsey was indebted to a number of other
people in the city of Roanoke.    Mrs. Dorsey also stated that
she was willing to take $1,200 for the whole property, but
being informed that she could not sell Dorsey's lots, she
expressed her willingness to sell her individual property to
Wilkinson for the sum of $800 in discharge of his debt
and at that time Wilkinson said he was willing to pay her
$900 for it.    Mr. Moomaw suggested to Mrs. Dorsey that
such an arrangement would not be fair to her, as she was
only the endorser on the notes and secondarily liable; that
the property of Joseph M. Dorsey should be exhausted first;
and that if she should pay the whole of that debt out of her
property it would leave his property for his other creditors,
whereas it should be applied to the·debts which he owed
ratably, and she should only be required to pay such balance
of the notes as was left after the property of Dorsey was
exhausted.    Seeing the propriety of this suggestion, Mrs.
Dorsey and Wilkinson thereupon entered into a contract in
which Mrs. Dorsey agreed to sell to Wilkinson her house
and lot for the sum of $900.    The contract provided that
a suit should be brought to settle the estate of Joseph M.
Dorsey and subject his property to the payment of his
debts; that such portion of the proceeds of said property as
would be applicable to the payment of Wilkinson's debt
should be credited on said debt, and that the balance of
said debt should be deducted by Wilkinson from the pur-
chase price he was to pay Mrs. Dorsey for her property.
A creditor's bill was filed to subject Dorsey's property to
the payment of his debts, and, the property being sold, Wil-
kinson received on his debt about $124, and was then ready
109

to make a settlement with Mrs. Dorsey for her property and pay her what was coming to her and receive a deed to the property.

This recital of facts is taken in a large degree from the petition for appeal, and is fully sustained by the preponderance of the testimony. There is, indeed, but little contradiction between the testimony of Mrs. Dorsey and that of the witnesses for Wilkinson. The only material difference is that Mrs. Dorsey asserts that she never authorized her husband to endorse her name upon the notes; that she signed the contract in the bill mentioned believing that she was bound to pay those notes; that she was not advised that she was not liable upon them; and that she had never seen the notes until they were shown to her at the time she gave her testimony.

In her testimony, in answer to questions, she said:

"Q. You placed the property you owned as being worth about $800 at that time, didn't you? A. $900 was what Mr. Wilkinson said.

Q. I understand, but you placed the full value of the property at $1,200 and you said the two lots were worth $200 apiece? A. Yes, sir.

Q. And it was then that Mr. Wilkinson said he would give you $900? A. Yes, sir.

Q. You also remember, don't you, we were making a calculation as to the amount of your debts? A. Yes, sir.

Q. That I stated to you if you sold your property that way you would not have much left? A. Yes, sir, after you brought in those notes of Mr. Dorsey.

Q. After I calculated what you owed Mr. Wilkinson and the other debts which you named, and got what you valued the property at, I told you that if you would sell the property that way you would not have much left? A. Yes, you did, but you see I did not know anything about those notes when I was trying to sell Mr. Wilkinson the property.

Q. You knew it before you came to my office? A. I do not remember that I knew anything about the notes until I came to the office. I knew Joe owed Mr. Wilkinson, but I did not know anything about the notes until I came to your office.

Q. Didn't you say Mr. Wilkinson spoke to you about the notes at your house when you called him down there? A. He did not say anything to me about the notes, but I knew Joe owed Mr. Wilkinson the money, but there was nothing said to me about the notes.

Q. Now, who spoke first about the debt at your house, you or Mr. Wilkinson? A. I must have spoken first about it.

Q. You spoke about the debt coming off the price of the property? A. I thought, you know, that it would leave me—Yes, I remember I spoke about that coming off the property. But, you see, I thought after Mr. Wilkinson got his money why there would be something coming to me. When I asked him about selling him the property, I did not know anything about the notes. I knew Joe owed this money and I thought if I could sell him the property then there would be something coming to me.

Q. And you offered to sell him the property and take Mr. Wilkinson's debt out of it, and then pay you the balance? A. Yes. After I sold him all this property. Then he said to me after I proposed selling him all the property, 'Well, you cannot sell Mr. Dorsey's property. That will have to go through court.' "

We think it appears, not only from the evidence of other witnesses, but from the testimony of Mrs. Dorsey herself, that she knew of this indebtedness on the part of her husband; that she intended to pay it out of the proceeds of the sale of her property; that she herself made the first proposal to that effect; and that her subsequent attitude is due to two causes—first, the fact that she found her husband's indebtedness other than that to Mr. Wilkinson would

absorb the greater part of his property, and, secondly, to influences which will always exert themselves to a greater or less extent under similar conditions. Immediately upon the death of her husband she felt a disposition to provide for his debts, which insensibly faded with time, while on the other hand the pressure of her situation was making itself felt each day with greater force. Here was a debt contracted by her husband in the ordinary course of business, for which he gave negotiable notes, placing her name upon them as endorser as he had before done without objection on her part. There was a strong motive to protect his good name, which prevailed with her in the first instance, but ascertaining that there was perhaps no legal liability upon her, the pressure of conditions finally overcame the sentiment by which she had been at first influenced, and she determined to stand upon her legal rights.

There is nothing to indicate that Mrs. Dorsey is ignorant or incompetent. She says that she had frequently endorsed her husband's notes before, but carefully discriminates as to the character of the notes which it was her custom to endorse; and we think the reading of the exhibit filed with the bill of itself plainly sets forth and carefully protects her rights, and shows knowledge upon her part of every essential condition. That she executed that instrument is not denied, and she was bound by it unless she maintains her position that it was obtained from her by fraudulent misrepresentation or by mutual mistake.

In *Solenberger* v. *Strickler,* 110 Va. 273, 65 S. E. 566, it is said that equity will not relieve against a mistake unless it be established by the clearest and most satisfactory evidence. *Bibb* v. *Am. Coal & Iron Co.,* 109 Va. 261, 64 S. E. 32.

It is not enough to show a possibility or even a probability of mistake. As was said by Lewis, P., in *Shenandoah Val. R. Co.* v. *Dunlop,* 86 Va. 346, 10 S. E. 239: "The authorities

all agree that equity has jurisdiction to reform written instruments in two well-fined classes of cases only, viz.: (1) Where there has been an innocent omission or insertion of a material stipulation, contrary to the intention of both parties, and under a mutual mistake; and (2) where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the remaining parties. But so great and obvious is the danger of permitting the solemn engagements of parties, when reduced to writing, to be varied by parol evidence, that in no case will relief be granted except where there is a plain mistake, clearly made out by satisfactory and unquestionable proof. According to some of the cases there must be a certainty of the error. At all events, the party alleging the mistake must show by evidence which leaves no reasonable doubt upon the mind of the court, not only exactly in what the mistake, if any, consists, but the correction that should be made. . . . A rule less rigid would be fraught with infinite mischief, since it would be destructive to the certainty and safety of written contracts." See also *Donaldson* v. *Levine,* 93 Va. 472, 25 S. E. 541; *Snyder* v. *Grandstaff,* 96 Va. 473, 31 S. E. 647, 70 Am. St. Rep. 863.

The evidence in this case not only fails to establish fraud or mistake by clear and satisfactory proof, but the preponderance of the proof maintains the fairness and integrity of the transaction.

We are of opinion that the decree of the corporation court should be reversed, and the cause remanded for further proceedings to be had not in conflict with this opinion.

*Reversed.*